## CORS v. UNITED STATES.
### No. 46796.

United States Court of Claims.
April 3, 1951.

Jones, Chief Judge, dissented in part.

Frank C. Mason, New York City, and
Harold A. Kertz, Washington, D. C.

(Charles B. McInnis, Washington, D. C., Mahar & Mason, New York City, and Roberts & McInnis, Washington, D. C., were on the brief), for plaintiff.

Joseph A. Klausner, New York City, Newell A. Clapp, Acting Asst. Atty. Gen. (John B. Miller, Washington, D. C., was on the brief), for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

In our opinion in this case, 75 F.Supp. 235, 110 Ct.Cl. 66, 77, et seq., we held that the plaintiff was entitled to recover the market value of his tug which defendant requisitioned, without any deduction therefrom on account of the defendant's need which necessitated the taking. The Supreme Court reversed us and remanded the case, with directions to us to determine how much of the enhancement in market value was due to the Government's need which necessitated the taking.

■ We referred the case to a Commissioner of this court to take additional evidence and to report the facts with respect to the amount of enhancement in the market value of plaintiff's vessel that resulted from the causes which necessitated the taking. After hearing such additional evidence, the Commissioner has made a report in which he found that the evidence of the amount of the enhancement due to the Government's need was "so conjectural and speculative that it is impossible to determine the amount by which the market value of plaintiff's vessel was enhanced as a result of the causes necessitating the taking, or to estimate the amount of such enhancement with reasonable accuracy." He found, however, that whatever this amount was, it was negligible.

We think these findings of the Commissioner are correct, and we have adopted them as the findings of the court.

■ In its opinion, 337 U.S. 325, on page 334, 69 S.Ct. 1086, 1091, 93 L.Ed. 1392, the Supreme Court said: "The government's need of vessels which has necessitated the taking is its need for the precise ship taken, for the type or class of ship taken, or for ships which perform the same or related functions. The government's need for cargo vessels may affect indirectly the price level of many commodities. It may, for example, affect the price of rowboats. But if the government takes a rowboat, the enhancement to be excluded is that which results from the government's activities in the particular market. It is the government's demand in that market that is the measure of the 'causes necessitating the taking or use' in this situation."

■ In view of this holding of the Supreme Court evidence was introduced which showed that there were five different classes of tugboats in the New York Harbor, that is to say, the tugboats in the harbor were designed to perform five different kinds of services. There were transport tugs, shiftings tugs, towing tugs operating within the harbor limits, towing tugs operating from the harbor to points outside, and railroad tugs used to tow car floats, etc. Plaintiff's tug was a shifting tug. Of the 525 tugs operating in the New York Harbor, there were 80 tugs capable of engaging in shifting operations.

Prior to October 1942 the defendant had either purchased or requisitioned 41 tugboats, but of these only four were shifting tugs. This is five percent of all the shifting tugs in the harbor. The requisition of so small a percentage of the total tugs of this type had but little effect on the market. The total of 41 tugs of all types purchased or requisitioned by the defendant was approximately eight percent of all the tugboats operating in the harbor, and this had but little effect on the market price of tugs. The Government's need for this particular tug was not to carry on shifting operations; it needed it and used it as a steam plant to heat oil for use in combat ships. Certainly this need which necessitated its taking could have had no effect on the market value of this tug. The predominant cause of the enhancement in value of these tugs was the large increase in harbor traffic.

In our former findings we said: "After May 27, 1941, and particularly after December 7, 1941, the date of the Japanese attack on Pearl Harbor, the rise in market

values was due to the Government's need for vessels, which necessitated the taking of many vessels, and to the great increase in shipping and in harbor traffic which occurred during the period of the war. These conditions combined to create a demand for and a shortage of tugs."

Further testimony shows this finding to have been somewhat inaccurate. On the former trial of this case the testimony relative to the causes which brought about the increase in value of tugs was of a general, more or less indefinite nature. No testimony was introduced to show the actual number of tugs acquired by the defendant or its effect on the market. On the subsequent trial of the case, however, the parties introduced specific and accurate testimony as to the number of tugs operating in the harbor, the type of tugs, and the number acquired by the defendant during the period September 8, 1939, to October 15, 1942.

The Government did not take many tugboats, as we said in our former findings; it only acquired eight percent of all the tugboats operating in New York Harbor, and it only acquired five percent of the particular type of tug involved in this case. Our former findings were incorrect in attributing any substantial part of the increase in the market value of tugs to the Government's need which, we said, necessitated the taking of many of them. As it turns out, only a very small percentage was taken.

To repeat, the increase in the value of tugs was due almost entirely to the great increase in shipping and harbor traffic which occurred during the period of the war. But the defendant says that the increase in harbor traffic was due largely to the Government's activities under the Lend-Lease program and in the prosecution of the war, and that the enhancement due to these activities is to be excluded.

■ It is true that the increase in shipping and harbor traffic was due, in large measure, to the Government's activities and that the owners of tugs operating in New York harbor were benefited by this increased business, just as thousands of persons throughout the country enjoyed increased business in connection with the production, processing, and distribution of the vast quantities of food and material that had to be supplied to the Government prior to and during the war. But we do not agree that any enhancement in the value of plaintiff's tug that resulted from this general and widespread increase in business which flowed from the Government's far-flung activities in wartime should be eliminated. The Act, 53 Stat. 1255, 46 U.S.C.A. § 1242, requires only the elimination of the enhancement in value brought about "by the causes *necessitating the taking or use.*" A showing of an increase in value from a general improvement in business conditions, including the tugboat business, is not proof that the enhancement in value of plaintiff's tug was caused by the Government's need which necessitated the taking of plaintiff's tug or of other tugs of the same type or tugs which could perform the same or related functions. Rule 4 of the report of the Advisory Board on Just Compensation, quoted with apparent approval by the Supreme Court, provides that enhancement due to a general rise in prices or earnings, whenever occurring, should not be deducted. Under this rule increase in value due to improved business conditions in the New York harbor, and, in fact, all over the country, is not to be deducted.

Indeed, the increase in business in the New York harbor was not the cause of the acquisition of many of these tugs; a large part of them was not used in New York harbor at all; but instead were sent to the British for use in the Red Sea and elsewhere.

Furthermore, the Government had no program for acquiring tugs generally. It acquired a tug only after it had ascertained that the particular tug was needed for a specific purpose. For example, it took plaintiff's tug, not for the purpose of using it as a shifting tug, but as a steam plant to heat oil for combat vessels. The sum total of the Government's needs required it to acquire only five percent of the shifting tugs in New York harbor, and the record is plain that these acquisitions had little effect on the market value of tugs.

■ It is also to be said that plaintiff acquired this vessel from the Government itself on March 19, 1942. He acquired it at a public sale, open to competitive bids. Presumably, any enhancement in value up to this date was reflected in the price the property brought at this sale. Certainly enhancement in value up to this time is not to be eliminated from the amount plaintiff is entitled to. This enhancement the Government received; plaintiff did not get it. Indeed, the Government admits that there is to be eliminated from the price to be paid plaintiff only that enhancement which occurred between March 19, 1942, and the date the vessel was requisitioned by the Government, in October of the same year. There is no convincing evidence that the market value of the vessel was enhanced in any ascertainable amount between March 19, 1942, and October 15, 1942, as a result of the causes necessitating the taking.

We are of opinion that it is impossible to determine from the testimony how much of the enhancement was due to the Government's need which necessitated the taking, but whatever the enhancement may have amounted to, we think it was negligible.

Plaintiff is entitled to recover $15,500, plus compensation for delay in payment computed at 4 percent per annum on this amount from October 15, 1942, until August 21, 1944, and on $8,750.00 from August 21, 1944, to date of payment. Against the aggregate the defendant is entitled to a credit of the amount already paid by it of $6,750.00. Judgment for this amount will be entered. It is so ordered.

HOWELL, MADDEN, and LITTLETON, JJ., concur.

JONES, Chief Judge (dissenting in part).

I agree that the enhancement that may be charged against plaintiff is limited to the period from March 19 to October 15, 1942. I also agree that the enhancement is comparatively small, but I cannot escape the conclusion that there was some enhancement due to "the causes necessitating the taking." The statute plainly says that in no case shall such enhancement be allowed in valuing the property. The Supreme Court has set out in specific terms the elements to be considered.

It is true that the facts in this case are not sufficient to measure these elements with mathematical accuracy. But it seems to me that we are no more justified in charging none of the enhancement than we would be in charging all the enhancement to such causes.

There are many values in life that cannot be determined with exactness in terms of money. Yet the courts do not for that reason wholly discard them. As illustrations, in personal injury cases recovery has been allowed for pain and suffering; in the case of a minor, the value of nurture, care and education which a parent would have given but for death caused by negligence of the defending litigant; for negligent failure to deliver death messages the telegraph company has been held for the mental suffering caused thereby; and recovery for patent infringement. In none of these cases is there an accurate yardstick. Yet in many of them a dollars and cents recovery has been allowed.

In a number of cases in which we felt the facts justified such action we have allowed recovery in what has been termed a jury verdict where there are substantial values, but no completely definite yardstick facts. The Supreme Court has approved. United States v. Smith, 94 U.S. 214, 219, 24 L.Ed. 115.

In this case the plaintiff paid $2,875 for the tug which was in need of repairs. He spent $5,699.79 for repairs and labor. The actual outlay would have been greater, but for the fact that the plaintiff, who was experienced in matters of this kind, and four men working under his supervision, performed a considerable part of the work.

On the other hand 16 tugboats were requisitioned between March 19 and October 15, 1942, and while this number was small as compared to the number operating in that area, the remaining ones benefited from the increase in shipping and harbor traffic during the war period. Prior to the beginning of that period some were acquired by purchase, but apparently after March 19, 1942,

464

they could be secured on a reasonable basis only by requisition. The stepping up of requisitions and efforts to purchase contributed to the enhancement.

The great number of submarine sinkings of all types of vessels caused a demand for almost anything that would float. We have no doubt that this prospect affected values in tugs as well as other vessels. These facts no doubt affected the use of and therefore the demand for tugs.

From these and all other facts in the record I would find the enhancement due to the causes necessitating the taking to be $1,500 and would allow plaintiff to recover on the basis of a value of $14,000 at the time of the taking, with appropriate offsets and interest items.